Filed 12/13/24  In re S.E. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.E., a Person Coming Under the Juvenile Court Law. | H051390 (Santa Clara County Super. Ct. No. 20JV44221C) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>S.E.,<br><br>        Defendant and Appellant. | |

After a contested jurisdictional hearing, the juvenile court sustained allegations against minor S.E. for second degree robbery (Pen. Code,[1] § 211) and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) (hereafter section 245(a)(4)).  The juvenile court declared S.E. a ward of the court, placed him under probation supervision, and prohibited him from possessing, owning, or controlling firearms until his 30th birthday.

On appeal, S.E. contends the juvenile court erred by failing to reduce the felony assault allegation to a misdemeanor because there was insufficient evidence to prove

---

[1] All further unspecified statutory references are to the Penal Code.

force likely to produce great bodily injury. He also maintains that the prohibition on possession of firearms set forth in section 29820 violates the Second Amendment to the United States Constitution.

For the reasons explained below, we disagree and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *The Offenses*

#### 1. January 2022 Incident (Count 1)

In January 2022, victim P.J. was a high school student in San Jose. While P.J. was sitting on a bench at school scrolling through social media, a group of five or six boys approached him. P.J. did not recognize them. One of the boys snatched P.J.'s cell phone from his hand. P.J. asked the boy to give the phone back, but the boy refused and shoved P.J. Other boys rummaged through P.J.'s backpack. Another boy in the group picked P.J. up and threw him to the ground, causing him to land on his shoulder and hit his head. After the boys walked away, P.J. reported the incident to a faculty member and spoke to police.

Thereafter, P.J. frequently saw the robber on campus but did not alert school staff or the police. About five months after the incident, the police showed P.J. a yearbook and he identified S.E. as the boy who had taken his phone. P.J. also identified S.E. in court.[2]

#### 2. December 2022 incident (Count 2)

In December 2022, S.E. and victim D.Q. worked together at a restaurant in San Jose.[3] During a break in his shift, D.Q. mistakenly drank from S.E.'s cup and apologized for doing so. S.E. became angry with D.Q. and uttered derogatory words at him. Near

---

[2] At the contested jurisdictional hearing, S.E. presented testimony in his defense from an expert on memory and eyewitness identification. We do not summarize the expert's testimony because it is not relevant to the claims raised in this appeal.

[3] D.Q. was 20 years old at the time he testified at the jurisdictional hearing in June 2023.

2

the end of his shift, S.E. told D.Q. that he (S.E.) was going to "grab" (i.e., fight) D.Q. and "pull a nine" on him (i.e., pull a gun on him).

D.Q. left work five minutes after S.E. When D.Q. exited the restaurant, he saw S.E. standing about 20 feet away, near a car containing some of S.E.'s friends. D.Q. testified that S.E. said, " 'Hey, there's that one [*sic*] nerd N-word that plays airsoft.' " S.E. walked toward the car's front passenger window, grabbed "a gun that sounded like an electric paintball gun or something," and shot at D.Q.'s face and chest.

D.Q. testified that the gun was "assault-rifle shaped, it was white, and it sounded electric." He described the projectiles fired by the gun as "pellets" that were "fast" and broke on impact. D.Q. had never seen that type of gun before and said, "I don't know what kind of pellets would break on impact, but when -- as soon as they hit me, they just broke, kind of shattered." The gun was "automatic," and S.E. fired multiple projectiles at the same time. The projectiles hit D.Q.'s "[l]eft hand, face, and upper chest." D.Q. testified that when the projectiles hit him, "[i]t stung." He also said that "[t]hey stung a little." More than 20, but fewer than 50 projectiles hit D.Q. during this initial attack, and S.E. fired the gun until it "went empty, and nothing was coming out."

D.Q. was scared by S.E.'s actions. After the shooting, D.Q. walked away and called his grandfather, asking to be picked up because he wanted to get home as soon as possible. D.Q. next walked to a nearby intersection to meet his grandfather. There, D.Q. saw the car from the restaurant approaching him. S.E. leaned out of the car's rear passenger window as it drove by and shot at D.Q. with the same gun. D.Q. raised his phone over his face to protect himself, and the projectiles hit D.Q.'s arm and the back of his phone. When the prosecutor asked D.Q. how many times he was hit and how many pellets were expelled, D.Q. answered, "I don't recall how many" but said it was "[l]ess than 20."

D.Q. walked away. The car made a U-turn and drove by D.Q. again. S.E. shot at D.Q. for a third time but missed. The car drove away and D.Q.'s grandfather picked him up.

On cross-examination, D.Q. acknowledged that he did not visit a doctor after the incident and did not suffer any injuries, bruises, or cuts. D.Q. explained that he was familiar with airsoft guns and knew that they fired metal or plastic projectiles. D.Q. further stated that the projectiles S.E. fired broke on impact, were "[s]imilar to a paintball," and did not leave any "broken plastic" or "any kind of broken fragments." D.Q. agreed that the projectiles "felt like . . . a gel ball or something like that." D.Q. acknowledged that he had told the police soon after the incident that during the first round of shooting, S.E. fired about 30 shots and at least 10 struck D.Q. Regarding the second round of shooting, D.Q. reported to the police that he had been hit five to 10 times. D.Q. testified further that S.E.'s gun looked "substantially similar to" a toy gun depicted on a box "labeled 'Splat R Ball' gun."[4]

On redirect examination, D.Q. explained that when he engages in recreational activities with airsoft or paintball guns, he wears a ballistic helmet, eye protection, face mask, body armor, and thick clothing to protect the vulnerable parts of his body, such as his eyes, nose, and face. D.Q. does this because he "could lose an eye." D.Q. explained that "[a]irsoft rifles shoot much hotter than the [gun]" that defense counsel had shown him (i.e., the speed of a projectile fired from an airsoft gun "is much higher"). D.Q. further explained that he covered his eyes when S.E. shot at him because he got hit "in the face and on the cheeks" and did not know what the projectile would do if it hit his eyes. He took the precaution to cover his eyes because he was not familiar with the type of projectile that S.E. was firing.

---

[4] The box that defense counsel showed to D.Q. during cross-examination was not entered into evidence.

### B. Juvenile Court Proceedings

In January 2023, the Santa Clara County District Attorney filed an amended juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)) alleging that S.E. committed second degree robbery against P.J. (§ 211; count 1) and assault by means of force likely to produce great bodily injury against D.Q. (§ 245(a)(4); count 2).

Following a contested jurisdictional hearing held in June and July 2023, the juvenile court found that S.E. committed both charged offenses, deemed the offenses to be felonies, and found the robbery to be in the second degree and a strike offense (§ 667, subd. (d)(3)). The court also found S.E. to be a ward of the court.

At a dispositional hearing held in August 2023, the juvenile court adjudged S.E. a ward of the court, returned him to his mother's custody, and placed him on probation with conditions. In accord with the probation officer's recommendation, the court ordered that S.E. "immediately surrender any and all firearms in his or her possession, custody and control and refrain from possessing, owning, or controlling any and all firearms until his . . . 30th birthday" in October 2035.[5]

## II. DISCUSSION

### A. Felony Assault Under Section 245(a)(4)

S.E. contends the juvenile court "should have reduced count [2] to misdemeanor assault because no rational trier of fact could find that the force used was likely to produce great bodily injury." (Boldface & capitalization omitted.) He further asserts "[t]here was insufficient evidence that [he] used force likely to produce great bodily injury against [D.Q.] No rational trier of fact could conclude that the gel spheroids shot from the [Splat R Ball] Water Bead Blaster toy gun were capable of force likely to

---

[5] Additionally, the juvenile court issued a restraining order against S.E., protecting D.Q. through August 22, 2026. The restraining order includes a further prohibition against S.E. owning, possessing, buying, attempting to buy, receiving, attempting to receive, or "in any other way get[ting]" a firearm, firearm part, or ammunition. S.E. makes no argument on appeal concerning this additional, shorter-term prohibition.

produce great bodily injury. [D.Q.], shot [20] to [50] times with the blaster, sustained no marks, scratches, or bruises." S.E. urges this court to reduce count 2 from felony assault to misdemeanor assault.

The Attorney General responds that the juvenile court acted properly in refusing to reduce count 2 because there was sufficient evidence to establish aggravated assault.

### 1. Additional Background

Prior to the jurisdictional hearing, S.E. filed a motion to reduce count 2 to a misdemeanor pursuant to Welfare and Institutions Code section 700.3.[6] S.E. asserted that shooting D.Q. with a toy Splat R Ball gun—which fires "soft water beads"—did not amount to a violation of section 245(a)(4) or felony conduct and was "more akin to a misdemeanor battery."[7] S.E. added that he had no new offenses in the preceding 14 months and otherwise had no criminal record.

The prosecutor opposed S.E.'s motion. The prosecutor argued that any reduction of the charged assault would be premature if done before the presentation of evidence regarding the offense and S.E.'s background and would usurp the district attorney's charging function.

After hearing oral argument from counsel for the parties, the juvenile court denied S.E.'s motion. The court stated that reducing the charge "would be completely usurping and stepping into the role of the executive." The court further explained that because no detention hearing had been held earlier in the case, it did not "have the benefit of that

---

[6] Effective January 1, 2023, Welfare and Institutions Code section 700.3 provides: "If a petition filed in the juvenile court alleging that a minor comes within the provisions of [s]ection 602 alleges that a minor has committed an offense that would, in the case of an adult, be punishable alternatively as a felony or a misdemeanor, the court, subject to a hearing, at any stage of a proceeding under [s]ection 602, may determine that the offense is a misdemeanor, in which event the case shall proceed as if the minor had been brought before the court on a misdemeanor petition." (Stats. 2022, ch. 197, § 37.)

[7] Section 245(a)(4) is a " 'wobbler[]' " offense "chargeable or, in the discretion of the court, punishable as either a felony or a misdemeanor." (*People v. Park* (2013) 56 Cal.4th 782, 789.)

information" and "there appear to be discrepancies in the facts [of the offense] that would be relevant to" the court's decision on any reduction of the charge.

Later, at the conclusion of the prosecution's case-in-chief at the jurisdictional hearing, S.E. moved for a directed verdict on count 2 (Welf. & Inst. Code, § 701.1). S.E.'s defense counsel asserted there was insufficient evidence that the force used was likely to produce great bodily injury. Counsel noted that D.Q. had testified (and photographs supported) that he suffered no physical injuries, marks, bruising, or redness from the shooting. Counsel also noted that D.Q. had said the projectiles "may have been gel balls" that broke apart on impact, and there was no evidence of any "shrapnel or metal or plastic . . . that could show [the projectiles] could produce great bodily injury." Counsel conceded that D.Q. was "hit in a vulnerable place" but noted that D.Q. suffered no injuries to his face. When the prosecutor asserted that "pellet guns are considered deadly and dangerous weapons," defense counsel said there was "enough evidence" that the gun S.E. used to shoot D.Q. "wasn't []either of those."

The juvenile court denied S.E.'s motion, stating: "[D.Q.] did use the word 'pellets,' he did talk about them breaking on impact, but he also testified about why he raised his hand. Obviously, these pellets were of the kind that could cause a significant injury if hit in specific parts of the body. And given the nature of the reading of the offense [*sic*], this [c]ourt believes that at this point sufficient evidence has been presented, and the motion is denied."

S.E. further moved the juvenile court to reduce count 2 to a misdemeanor under Welfare and Institutions Code section 700.3. The court took that motion under submission and stated it would rule on it at the end of the case.

Later, after the defense had presented its case and counsel made their closing arguments, the juvenile court found that the prosecution had proved count 2 beyond a reasonable doubt, denied S.E.'s motion to reduce count 2 to a misdemeanor, and deemed count 2 a felony. The court explained its ruling on the motion as follows: "The facts as

7

presented by [D.Q.] are aggravated.  There were three separate times where [D.Q.] was attacked by a pellet gun.  As to the first one, the minor was waiting for [D.Q.]  As to the second and third, the minor followed [D.Q.] as he walked away.  On one of these occasions, [D.Q.] was struck in the hand as he protected his face, which speaks to where the minor was aiming when shooting the pellets.  With these facts, the [c]ourt agrees the conduct is more aggravating than it is mitigating and denies the motion to reduce [c]ount 2 to a misdemeanor.”

### 2.  Legal Principles

" 'The standard of proof in juvenile proceedings involving criminal acts is the same as the standard in adult criminal trials.' " (*In re Cesar V.* (2011) 192 Cal.App.4th 989, 994; see also *People v. Trujeque* (2015) 61 Cal.4th 227, 247; Welf. & Inst. Code, § 701.)  In a juvenile appeal, courts apply the same appellate standard of review as that used when an adult defendant challenges the sufficiency of the evidence to support a conviction.  (*Cesar V.*, at pp. 994–995; see also *In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1371–1373.)

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' "[8] (*People v. Powell* (2018) 5 Cal.5th 921,

---

[8] S.E. and the Attorney General frame their arguments on appeal under this familiar standard and do not mention the abuse of discretion standard of review.  Given the positions of the parties in this appeal, we do not consider whether an appellate claim that specifically challenges a juvenile court's denial of a motion under Welfare and Institutions Code section 700.3 is subject to review for an abuse of discretion.  (Cf. *People v. Mullins* (2018) 19 Cal.App.5th 594, 611 ["We review the trial court's ruling on a motion to reduce a felony to a misdemeanor pursuant to . . . section 17, subdivision (b) for an abuse of discretion and give deference to the trial court's weighing of the relevant factors."]; see also *People v. Gregerson* (2011) 202 Cal.App.4th 306, 319 [" '[T]he

944.)  "In applying this test, we . . . presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "We 'must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' "  (*Ibid*.)  " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [trier of fact]'s verdict."  (*Ibid*.)  "However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.  [¶]  . . .  A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' "  (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

"Section 245 'prohibits an assault by means of force *likely* to produce great bodily injury, not the use of force which does in fact produce such injury.  While . . . the results of an assault are often highly probative of the amount of force used, they cannot be conclusive.'  [Citation.]  Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate.  [Citations.]  ' "The crime . . ., like other assaults may be committed without the infliction of any physical injury, and even though no blow is actually struck.  [Citation.]  The issue, therefore, is not whether serious injury was caused, but whether the force used was such as would be likely to cause it." ' "  (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748; see also *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028; *People v. Roberts* (1981) 114 Cal.App.3d 960, 964–965; *People v. Covino* (1980) 100 Cal.App.3d 660, 667.)

" '[T]he question of whether or not the force used was such as to have been likely to produce great bodily injury, is one of fact for the determination of the [trier of fact]

practical differences' between the abuse of discretion and substantial evidence standards of review 'are not significant.' "].)

9

based on all the evidence, including but not limited to the injury inflicted.' " (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066; see also *People v. Sargent* (1999) 19 Cal.4th 1206, 1221.) " 'Likely means probable or . . . more probable than not.' " (*People v. Russell* (2005) 129 Cal.App.4th 776, 787.)

3. Analysis

We decide that substantial evidence supports the juvenile court's finding that the force used by S.E. in shooting at D.Q. was likely to cause great bodily injury. D.Q. testified that the fast-moving projectiles fired at his face and upper body seemed to be "gel ball[s] or something like that," which broke apart and "stung" when they hit him. D.Q. further explained that S.E. fired the first round of 20 to 50 projectiles from a distance of approximately 20 feet, and D.Q. protected his eyes from injury by raising his arm and cell phone over his face during the shootings.

Eyes are a particularly vulnerable organ. "A slight blow on the eye might be far more injurious than a severe blow in the back." (*People v. McIlvain* (1942) 55 Cal.App.2d 322, 331, disapproved on other grounds in *People v. Brown* (1947) 29 Cal.2d 555, 560.) D.Q.'s testimony about the nature of the projectiles, the number of projectiles fired at and around his face, and the distance from which they were fired, coupled with D.Q.'s description of the need to protect his eyes from being hit by the shattering and stinging projectiles provide substantial evidence that the force used by S.E. was likely to cause significant injury to D.Q.'s eyes if struck. (See *In re Nirran W.* (1989) 207 Cal.App.3d 1157, 1161–1162 [a single blow to a victim's face may constitute force likely to produce great bodily injury]; *People v. White* (1961) 195 Cal.App.2d 389, 392 [a single blow to the eye "delivered with great force" supported charge of assault by means of force likely to produce great bodily injury where "the assault was unprovoked and delivered at a time [the victim] not prepared to protect himself"].)

Based on the entire record, we conclude there is sufficient evidence from which a reasonable trier of fact could find beyond a reasonable doubt that the force S.E. used

against D.Q. constituted force likely to produce great bodily injury for assault as alleged in count 2. In turn, we are not persuaded by S.E.'s claim that the juvenile court erred by not reducing count 2 to a misdemeanor.

### B. Firearm Prohibition Under Section 29820

S.E. contends section 29820's prohibition against a ward of the juvenile court owning, possessing, or controlling a firearm until age 30 (hereafter firearm prohibition) violates the Second and Fourteenth Amendments to the United States Constitution.

The Attorney General disagrees. He argues that a juvenile who has been adjudicated a ward of the court for committing robbery and felony assault does not have a Second Amendment right to possess a firearm and restricting a convicted violent felon's access to firearms is consistent with our nation's historical tradition of firearms regulations. The Attorney General further asserts that to the extent S.E. seeks to challenge the firearm prohibition before he turns 21, "he may not do so because persons under 21 years old are not part of the 'people' whose right to 'keep and bear Arms' are protected by the text of the Second Amendment."

Although S.E. did not raise a Second Amendment challenge to the firearm prohibition in the juvenile court, he contends that his appellate claim is cognizable because it "presents a facial challenge to the divestment of his right to bear arms until age 30, by operation of law, and as a condition of probation."[9] Because S.E.'s claim challenges the constitutionality of section 29820 on its face, S.E. may raise that claim for

---

[9] S.E. describes the firearm prohibition as both a condition of probation and an independent restriction imposed on him by operation of law. Any difference between these two rubrics does not alter our consideration of S.E.'s facial challenge to the firearm prohibition. (See *In re M.A.* (2022) 83 Cal.App.5th 143, 153–154 [concluding that the statutory prohibition in section 29820 applied to the juvenile and finding no abuse of discretion to the extent the juvenile was challenging the imposition of the prohibition as a probation condition because the prohibition is statutorily authorized and required under section 29820].)

the first time in this appeal.  (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474 (*Alexander*).)

### 1.  Section 29820 and Second Amendment Principles

Section 29820 provides, in relevant part, that a person is prohibited from owning, possessing, or exercising custody or control of a firearm until the age of 30 if:  (1) the person is alleged to have committed, inter alia, an offense listed in subdivision (b) of Welfare and Institutions Code section 707; and (2) the person is adjudged a ward of the juvenile court within the meaning of Welfare and Institutions Code section 602 because the person committed a predicate offense.  (§ 29820, subds. (a)(1)(A), (a)(2), (b).[10])  "[Welfare and Institutions Code] [s]ection 707, subdivision (b) lists 30 serious and violent crimes."  (*In re Edward C.* (2014) 223 Cal.App.4th 813, 823.)  Robbery and assault by any means of force likely to produce great bodily injury are among those offenses.  (Welf. & Inst. Code, § 707, subd. (b)(3) & (14).)

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  (U.S. Const., 2d Amend.)  States are subject to the Second Amendment under the due process clause of the Fourteenth Amendment.  (*McDonald v. City of Chicago* (2010) 561 U.S. 742, 791.)

In *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*), the United States Supreme Court held that the rights granted by the Second Amendment include "the right

---

[10] Section 29820, subdivision (a) provides, in part:  "This section applies to a person who satisfies both of the following requirements:  [¶]  (1) The person meets one of the following:  [¶]  (A) The person is alleged to have committed an offense listed in subdivision (b) of [s]ection 707 of the Welfare and Institutions Code.  [¶] . . . [¶]  (2) The person is subsequently adjudged a ward of the juvenile court within the meaning of [s]ection 602 of the Welfare and Institutions Code because the person committed an offense listed in paragraph (1)."

Section 29820, subdivision (b) provides:  "A person described in subdivision (a) shall not own, or have in possession or under custody or control, a firearm until the person is 30 years of age or older."

of law-abiding, responsible citizens to use arms in defense of hearth and home." (*Id*. at p. 635.) The *Heller* court further stated, "Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." (*Id*. at p. 626.)

In *New York State Rifle & Pistol Assn. Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*), the United States Supreme Court extended its holding in *Heller* to recognize "an individual's right to carry a handgun for self-defense outside the home." (*Id*. at p. 10.) *Bruen* decided a Second Amendment challenge to New York's firearm licensing scheme brought by two New York residents who had separately applied for unrestricted licenses to carry handguns in public. The residents alleged they were denied such licenses on the grounds "that they had failed to show 'proper cause,' *i.e.*, had failed to demonstrate a unique need for self-defense." (*Id*. at p. 16.)

The *Bruen* court articulated a text and history test for analyzing constitutional challenges based on rights granted by the Second Amendment. (*Bruen*, *supra*, 597 U.S. at p. 17.) "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Ibid*.)

Writing for the court and separately, justices in the *Bruen* majority reiterated that the Second Amendment does not protect a right to " 'keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' " (*Bruen*, *supra*, 597 U.S. at p. 21 (maj. opn. of Thomas, J.); *id*. at pp. 80–81 (conc. opn. of Kavanaugh, J.), citing *Heller*, *supra*, 554 U.S. at p. 626.) They cautioned that an individual's Second Amendment right remains "subject to certain reasonable, well-defined restrictions"

(*Bruen*, at p. 70), including the " 'longstanding prohibitions on the possession of firearms by felons.' " (*Id*. at p. 81 (conc. opn. of Kavanaugh, J.).)

After engaging in a textual and historical analysis of New York's regulation of firearms, the *Bruen* court found unconstitutional New York's requirement that gun license applicants establish "proper cause" to obtain an unrestricted license to carry handguns in public. (*Bruen*, *supra*, 597 U.S. at p. 71.)

Recently, in *United States v. Rahimi* (2024) 602 U.S. ___, 144 S.Ct. 1889 (*Rahimi*), the United States Supreme Court "reject[ed] a Second Amendment challenge to a statute prohibiting a person subject to a domestic violence restraining order from possessing a firearm. [Citations.] No historical evidence suggested the founding generation had any familiarity with domestic violence restraining orders, let alone a practice of disarming those subject to them, but the high court had 'no trouble concluding' the statute survives constitutional challenge. [Citation.] Supreme Court 'precedents were not meant to suggest a law trapped in amber,' the *Rahimi* Court emphasized. [Citation.] '[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791.' [Citation.] The *Rahimi* Court reviewed historical evidence drawn from English and early American law and concluded that these older firearm regulations 'confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.' " (*People v. Anderson* (2024) 104 Cal.App.5th 577, 585–586 (*Anderson*); see also *Rahimi*, at p. ___ [144 S.Ct. at pp. 1901–1902.)

2.  Standard of Review

" ' "A defendant challenging the constitutionality of a statute carries a heavy burden: 'The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.' " ' " (*In re D.L.* (2023) 93 Cal.App.5th 144, 156 (*D.L.*).)

14

"Typically, a litigant may challenge the constitutionality of a statute in two ways: on its face or as applied." (*D.L.*, *supra*, 93 Cal.App.5th at p. 156.) "A facial challenge seeks to void the statute as a whole by showing that ' "no set of circumstances exists under which the [statute] would be valid," *i.e.*, that the law is unconstitutional in all' " (*id.* at p. 157; see also *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084) or at least the " ' "great majority of cases" ' " (*In re T.F.-G.* (2023) 94 Cal.App.5th 893, 909, italics omitted). "In analyzing a facial challenge to the constitutionality of a statute, we consider 'only the text of the measure itself, not its application to the particular circumstances of an individual.' " (*Alexander*, *supra*, 91 Cal.App.5th at p. 474.)

"Our review is de novo, as the issues before us involve the reach and application of the Second Amendment." (*Anderson*, *supra*, 104 Cal.App.5th at p. 584.)

3. Analysis

S.E. asserts that "California's bar on individuals found wards of the juvenile court for certain crimes from owning, possessing, or exercising control over firearms until they reach age 30 is an unreasonable restriction on their pre-existing right to bear arms codified under the Second Amendment." We are not persuaded.

"Like most rights, the right secured by the Second Amendment is not unlimited." (*Heller*, *supra*, 554 U.S. at p. 626.) Many "regulations that forbid firearm possession in the home," "like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' " (*Rahimi*, *supra*, 602 U.S. at p. ___ [144 S. Ct. at p. 1902].) Further, "the analogical reasoning required to justify regulation of activity presumptively protected by the Second Amendment is not 'a regulatory straightjacket.' [Citation.] Courts should not endorse ' "outliers that our ancestors would never have accepted," ' but beyond that, 'analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.' " (*Anderson*, *supra*, 104 Cal.App.5th at p. 599.)

15

In *Anderson*, the First District Court of Appeal, Division Three considered a defendant's Second Amendment challenge to his convictions for being a felon in possession of a firearm (§ 29800, subd. (a)(1)), being a felon in possession of ammunition (§ 30305, subd. (a)), and carrying a concealed firearm (§ 25400, subd. (a)(2)). (*Anderson*, *supra*, 104 Cal.App.5th at pp. 582–583.) The *Anderson* court explained that "*Rahimi* does not resolve the case before us, as the statute it analyzed 'applies only once a court has found that [an individual] defendant "represents a credible threat to the physical safety" of another.' [Citation.] But the high court purposefully did 'not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse.' [Citation.] In this way, *Rahimi* reaffirms the portion of *Heller* that cautions, 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill.' " (*Id*. at p. 586.)

Undertaking an analysis of historical traditions, the *Anderson* court "conclude[d] that sources from 17th-century England, colonial America, and the early federal period demonstrate that California's felon-in-possession firearm regulations comport with our national tradition of firearm regulation. In that tradition, categories of persons thought to pose a danger to the community were forbidden to have arms, and individuals were sometimes disarmed as a consequence of being convicted of criminal conduct. When the founding generation framed and debated constitutional text, it considered such limitations inherent in the right the Second Amendment protects." (*Anderson*, *supra*, 104 Cal.App.5th at p. 589; see also *id*. at pp. 589–595.)

Assuming arguendo that the Second Amendment applies to S.E. notwithstanding his status as a felon and a person under 21 years old, we are not persuaded by S.E. to disregard *Anderson* and "instead find the lack of historical analogue for section 29820[, subdivision] (b)." Considering the historical record detailed by the Attorney General in

16

his briefing and the court in *Anderson*, the firearm prohibition prescribed by section 29820 is not unconstitutional on its face.  We agree with the *Anderson* court that "categorical disarmament laws are not inconsistent with the Second Amendment" (*Anderson*, *supra*, 104 Cal.App.5th at p. 598) and the "historical evidence shows that individuals were disarmed as a preventative measure when the law assessed they were unwilling to respect sovereign authority, *and* they were disarmed as a sanction for criminal conduct, whether or not involving physical violence.  California's felon disarmament measures are ' "relevantly similar" ' in serving both of these purposes." (*Ibid.*)  Section 29820's prohibition on wards who have committed certain predicate offenses (including serious and violent crimes) from owning, possessing, or exercising custody or control of a firearm until age 30 is akin to the firearm restrictions based on prior criminality upheld in *Anderson*.

For these reasons we conclude that section 29820, subdivision (b) is, on its face, constitutional and does not violate the Second Amendment.

### III.  DISPOSITION

The judgment is affirmed.

_____
Danner, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.




_____
Wilson, J.




**H051390**
*People v. S.E.*